IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

METRO TECH, CORP.,

           Plaintiff

              v.

TUV RHEINLAND OF NORTH AMERICA,
et al.,

           Defendants

CIVIL NO. 09-1824 (JP)

## OPINION AND ORDER

     Before the Court is Defendant TUV Rheinland of North America, Inc.'s ("TUV") motion for partial summary judgment (**No. 48**), Plaintiff Metro Tech, Corp.'s ("Metro Tech") opposition (No. 60), and Defendant TUV's reply thereto (No. 67).  Also before the Court is Plaintiff's Motion to Strike and/or for Summary Disposition of Defendant's Motion for Summary Judgment (**No. 57**).  On August 19, 2010, Plaintiff brought the instant action, pursuant to diversity jurisdiction, alleging that Defendant TUV breached its contract with Plaintiff by delaying to issue Plaintiff's ISO 17025 re-certification and by incorrectly informing Plaintiff's customers that Plaintiff did not have ISO 17025 certification.  Defendant moves for partial summary judgment pursuant to Fed. R. Civ. P. 56 as to all of Plaintiff's damages claims with the exception of those that flow from the cancellation of the contract between "Instituto de Innovación en Biotecnología e Industria" ("IIBI") and Plaintiff (the

CIVIL NO. 09-1824 (JP)          -2-

"IIBI Contract").  Defendant also moves to dismiss Plaintiff's obstinacy claim in its entirety.  For the reasons stated herein, Defendant's motion for partial summary judgment is **GRANTED IN PART AND DENIED IN PART** and Plaintiff's motion to strike is **DENIED**.

I.   MATERIAL FACTS NOT IN GENUINE ISSUE OR DISPUTE

The following material facts were deemed uncontested ("ISC UMF") by all parties hereto pursuant to the Amended Initial Scheduling Conference Order, dated April 22, 2010 (No. 31).

1. Plaintiff Metro Tech is a corporation organized under the laws of the Commonwealth of Puerto Rico with its principal place of business located in San Lorenzo, Puerto Rico.

2. Defendant TUV is a corporation created and organized under the laws of the State of Delaware with its principal place of business and main offices located in Newton, Connecticut.

3. TUV conducted the necessary assessments and processes and certified Plaintiff as an ISO 17025 certified company on August 12, 2002.  Said certification was valid for three (3) years.

4. On August 12, 2002, TUV issued an ISO 17025 Accreditation Certificate to Metro Tech, effective August 12, 2002 to August 12, 2005.

5. On June 23, 2003, TUV issued a quotation for Metro Tech's first annual surveillance assessment.

CIVIL NO. 09-1824 (JP)          -3-

6.   In August of 2003, Metro Tech was to undergo its first annual surveillance assessment.  This assessment failed to go forward due to non-payment by Metro Tech.

7.   On January 8, 2004, Metro Tech underwent its first annual surveillance assessment.

8.   In October of 2004, Metro Tech was to undergo a second annual surveillance assessment; however, the surveillance did not occur due to the continued non-payment of the invoice for the January 8, 2004 first annual surveillance assessment.

9.   Metro Tech requested TUV to issue a recertification for another three (3) years and issued the corresponding Purchase Order on March 30, 2005.

10.  From March thru July 2005, TUV and Metro Tech were engaged in addressing prepayment of Metro Tech's reassessment audit.   Metro Tech paid the $5,000 fee in two installments, the last being in mid-July 2005.

11.  From November 14 through 16, 2005, Metro Tech underwent its reassessment evaluation for renewal of its ISO 17025 certificate.

12.  From November 2005 through May 2006, Metro Tech addressed the deviations noted in TUV's Brief Assessment Report.

13.  Via correspondence dated January 5, 2007, Ramón D. Sánchez ("Sánchez"), President of Technalab, S.A. ("Technalab"),

CIVIL NO. 09-1824 (JP)            -4-

advised José A. Cotto ("Cotto"), Managing Partner of CMCXpert Group, Inc.("CMCXpert"), Metro Tech's agent in the Dominican Republic, that the reason Technalab's business with IIBI and the people they serve dropped drastically since 2006 is that CMCXpert is associated with Metro Tech, a disqualified ISO 17025 company.

14. On January 23, 2007, Metro Tech and IIBI executed a contract which was to be effective for a period of one (1) year (retroactive date of October 1, 2006 to September 30, 2007).

15. On January 27, 2007 Metro Tech entered into a contract for services with IIBI pursuant to Metro Tech's Service Quote 06TSQ-150 and its General Proposal 05TSQ-284. As part of said contract, Metro Tech was required to be an ISO 17025 certified company.

16. On June 29, 2007, TUV received an inquiry from IIBI, a Dominican Republic company, concerning Metro Tech's ISO 17025 accreditation status.

17. In July of 2007, TUV notified Metro Tech, that accreditation would no longer be offered effective September 1, 2008 and that TUV had partnered with Assured Calibration and Laboratory Accreditation Select Services ("ACLASS") for the transition of the ISO 17025 service.

CIVIL NO. 09-1824 (JP)          -5-

18. On July 2, 2007, an email exchange occurred involving, among others, Terrell Selby, call center representative at TUV, and Carrie Philbrick, regional sales manager of TUV. The contents of said email exchange are incorporated by reference hereto.

19. The email further advised that: "TUV Rheinland no longer provides accreditation services for ISO 17025 but is now partnering with a company called ACLASS to assist customers with ISO 17025:2005 requests."

20. On August 3, 2007, Bernarda A. Castillo, Executive Director of IIBI advised Metro Tech via correspondence that it was terminating the Metro Tech—IIBI contract in light of TUV's confirmation that Metro Tech was not accredited to provide services.

21. On August 3, 2007, the executive director of IIBI sent a letter to Metro Tech, which is incorporated by reference hereto.

22. After August 3, 2007, Metro Tech contacted TUV and subsequently TUV issued a renewed accreditation certificate.

23. On September 13, 2007, Metro Tech advised TUV that it had yet to receive a re-certification document.

24. On September 26, 2007, TUV issued Metro Tech Certificate of Accreditation No. 74 400 2081 with a retroactive

CIVIL NO. 09-1824 (JP)           -6-

          effective date of April 20, 2006 and an expiration date of August 12, 2008.

    25.   On November 19, 2007, Richard Bernier ("Bernier") of TUV met with Julio M. Cay-Montañez ("Cay"), of Metro Tech in Puerto Rico, to discuss the foregoing events and to seek possible resolution of Metro Tech's claim of damages.

The following facts are deemed uncontested ("UMF") by the Court because they were included in the motions for summary judgment and oppositions and were agreed upon, or they were properly supported by evidence and not genuinely opposed.

    1.   The documents marked as Exhibit N of Cay's deposition are the following:

        a.   Quotations issued by Metro Tech to entity named "Riquel Group, Inc." totaling $2,076,142.29, with quotation numbers:

- 05SQ-0283
- 05SQ-0283R
- 05SQ-0284R
- 05SQ-0285
- 05SQ-0285R
- 05SQ-0287
- 05SQ-0287R
- 05SQ-0288
- 05SQ-0288R
- 05SQ-0300
- 05SQ-0319
- 05SQ-0320
- 05SQ-0323
- 05SQ-0342
- 05SQ-0343
- 05SQ-0344

CIVIL NO. 09-1824 (JP)            -7-

    b.   Quotation number 05TSQ-081 issued by Metro Tech to entity named "Pedro Panzardi & Associates" totaling $685,000.00.

    c.   Quotations issued by Metro Tech to entity named IIBI, totaling $710,700.00, with quotation numbers:

- 05TSQ-104
- 05SQ-104R
- 06TSQ-150
- 05TSQ-284
- 07TSQ-163

    d.   Quotation number 08TSQ-242 issued by Metro Tech to entity named "Autoridad de Carreteras" totaling $75,000.00.

    e.   Quotation number 08TSQ-316 issued by Metro Tech to entity named "Thomas & Betts" totaling $2,540.00.

    f.   Quotation number 08TSQ-019 issued by Metro Tech to entity named "Edwards Lifesciences" totaling $31,800.00.

    g.   Quotation number 08TSQ-321 issued by Metro Tech to entity named "Caribbean Refrescos" totaling $84,300.00.

    h.   Quotation number 06TSQ-025 issued by Metro Tech to entity named "Striker" totaling $48,000.00.

    i.   Quotation number 06TSQ-160 issued by Metro Tech to entity named "Pace Analytical" totaling $4,835.00.

CIVIL NO. 09-1824 (JP)          -8-

      j.   Quotation number 07TSQ-291 issued by Metro Tech to entity named "Guidant" totaling $1,260.00.

      k.   Quotation number 07TSQ-313 issued by Metro Tech to entity named "Biovail Laboratories" totaling $93,564.00.

      l.   Quotation number 07TSQ-310 issued by Metro Tech to entity named "Chesebrough Pond´s Manufacturing" totaling $7,500.00.

      m.   Quotation number 09TSQ-030 issued by Metro Tech to entity named "Alchem" totaling $21,348.00.

      n.   Service contract executed between Metro Tech and IIBI executed on January 27, 2007.

      o.   Document entitled "General Proposal" issued by Metro Tech to IIBI.

2.   The stipulation agreed by the parties allowed Metro Tech to introduce as evidence correspondence or similar documents "pertaining to previous business dealings" with clients "that will show that Metro Tech had prior business dealings with those clients, although none of those other documents will be used for the actual damage calculation."

3.   Guidant refused to continue to do business with Metro Tech in 2007 even when it was certified at that time as it had lost confidence in Metro Tech.  Upon not receiving confirmation of Metro Tech's certification Guidant

CIVIL NO. 09-1824 (JP)            -9-

determined to no longer do business with them. When Metro
Tech attempted to re-start the relationship by sending the
quote and the certificate produced by TUV it was too late.

4.    Metro Tech had a business relationship with Biovail
Laboratories prior to issuing quote 07-TSQ-313 in the
amount of $93,564.00 in December 2007.  Metro Tech,
however, lost this quote for services as a result of Metro
Tech not being able to timely provide Biovail evidence of
its ISO 17025 accreditation. "Metro Tech record had been
damaged."

5.    Metro Tech started a business relationship with the
Highway
Authority in March 2003 when it signed a multi-annual
contract with the governmental entity for the calibration
of equipment.

6.    Metro Tech entered into a contract extension with the
Highway Authority on October 3, 2005.  Metro Tech,
however, had to comply at all times with ISO 17025
standard.

7.    On April 6, 2006 Metro Tech entered into a new agreement
with the Highway Authority for the provision of
calibration service subject to the ISO 17025 standard.
The contract amount was for $57,240.00.

CIVIL NO. 09-1824 (JP)              -10-

8.    Metro Tech continued to provide service to the Highway
      Authority through purchase orders until September 2007.

9.    Metro Tech submitted to the Highway Authority quote
      08TSQ-242 on September 17, 2008 for $75,000.00.  Metro
      Tech was the lowest bidder in the procurement process.

10.   Metro Tech had a business relationship with Thomas & Betts
      Caribe, Inc. prior to issuing quote 08-TSQ-316 in the
      amount of $2,540.00 in November 17, 2008.  Thomas & Betts
      have a sensitive medical equipment production area that
      required ISO 17025 certification.

11.   Metro Tech had a business relationship with Caribbean
      Refrescos prior to issuing quote 08-TSQ-321 in the amount
      of $84,300.00 in November 24, 2008.

12.   Metro Tech services to Caribbean Refrescos had to comply
      with ISO 17025.

13.   Cotto explained the dynamics of the effect of TUV's
      actions and its effects on Metro Tech's business
      describing that:

            A:   Julio Cay, you know, IIBI and Julio Cay met
                 in a scientific forum, and he offers his
                 services, you know, and the ISO 17025, and
                 IIBI asked a due diligence to Sánchez, "who
                 is Julio Cay"? And Sánchez comes, he
                 doesn't know Julio Cay then, you know.  He
                 says, hey do you know, you know IIBI is
                 thinking of doing this with Julio Cay.  And
                 basically I guess this is not the right
                 word, I say well, he's the best thing since
                 shirt pockets.

CIVIL NO. 09-1824 (JP)          -11-

     Q:   Mmhm?

     A:   You know, I give him a rave review, you know.  So Sánchez comes around, gives the good news to IIBI, and IIBI comes and do the contract, you know, the contract negotiation.

     Q:   With IIBI.

     A:   IIBI because Julio tells IIBI that he is TUV accredited.

     Q:   Okay.

     A:   So when it happens that TUV says he's no longer certified, the whole thing has, you know, breaks down in reverse, you know. IIBI tell Sánchez, hey you gave me bad information, and your business here is in jeopardy.  Sánchez calls me and I write a letter to Julio.  That's the whole thing.

14. Cotto was informed by at least 3 of his clients, including Sánchez that Metro Tech had been providing incorrect and fraudulent information regarding their ISO 17025 certification.   These clients were the veterinary laboratory, the Association of Agriculture and Sánchez.

15. Cotto handled the quotes involving the Riquel Group.  The quotes are a proposal to change old instruments in a laboratory repeating a project Cotto did in 1994.

16. Cotto was the contact for Metro Tech for Pedro Panzardi & Associates ("Panzardi") as Cotto knew Mr. Panzardi from the time he worked at ERM as Mr. Panzardi was the CEO of ERM.

CIVIL NO. 09-1824 (JP)          -12-

17. In 2005, Panzardi and ERM were clients of Cotto and even provided him with office space and access to clerical staff.

18. Metro Tech's Quotation 05-TSQ-81 in the amount of $685,000.00 for Panzardi was channeled through Cotto. The end user for this quotation was IIBI. The quote was issued to Panzardi as the quote required services for a environmental laboratory that is Panzardi's specialty.

19. Javier A. Otero-Santos ("Santos") had to travel on three (3) occasions related to the negotiation and signing of the IIBI contract.

20. Cotto performed work through his company called CMCXpert, a company registered in the Contractor Registry for the Federal Government as a handicapped veteran association.

21. Cotto performed work in the French Caribbean through a re-seller of laboratory equipment, Ronnie Sookhoo and in Haiti and Dominican Republic through Sánchez.

22. In the Dominican Republic Cotto worked through Sánchez's company called Technalab and sometimes on his own.

23. Cotto was so angry at Cay that he wrote a letter concerning the damages suffered to their business efforts due to the IIBI affair as he did not want to talk to Cay. He also decided to sever all business ties with Cay as suggested in Sánchez's letter, dated January 2007.

CIVIL NO. 09-1824 (JP)          -13-

24.  The certificate, while dated April 2006, was actually prepared and printed by David Moody on September 26, 2007. Previously, on July of 2007 TUV had notified Metro Tech that it would no longer continue to offer ISO 17025 accreditation and on September 13, 2007 Metro Tech advised TUV that it had yet to receive a re-certification document.

25.  While originally TUV had informed its ISO 17025 customers, including Metro Tech, that it was not going to continue certifying any of them after September 1, 2007, this date was later extended to September 1, 2008.

26.  Bernier stated:  "Yes.  I believe if I remember correctly there was a few clients who had come back and asked why the date of September 1st, 2007 seemed a like short period of time.  And I at that point pointed out to those clients that you are right, that was a mistake, I should at least give you 12 months or more to do that transition.  Those clients who asked the question.  And I had corrected it in the main document."

27.  Bernier did not notify Metro Tech of the extended term for reassessment of ISO 17025.  He did not even instruct any of his auditors or subordinates to contact Metro Tech with such information.

CIVIL NO. 09-1824 (JP)          -14-

28.   TUV determined that if an audit was scheduled for any time prior to September 1, 2007, TUV will certify such client, upon completion of the audit for a new term.  However, if the audit fell beyond the transition period (after September 1, 2007) then the client will have to perform the audit with ACLASS or a different accrediting entity. This period, however, was extended as Bernier recognized his mistake in providing too short a period for clients, up to September 1, 2008.  Metro Tech, however, was never informed of this enlargement of time.

29.   TUV had a verbal agreement with ACLASS upon which it agreed to refer its ISO 17025 clients to ACLASS for certification and service.

## II.   **PLAINTIFF'S MOTION TO STRIKE DEFENDANT'S SEPARATE STATEMENT OF MATERIAL FACTS**

On September 1, 2010, Plaintiff filed a motion to strike and/or for summary disposition of Defendant's motion for summary judgment (No. 57).  According to Plaintiff, Defendant's Separate Statement of Material Facts ("Separate Statement") (No. 49) failed to include "a single reference to the record in the 16 numbered paragraphs" and included conclusory allegations in violation of the requirements of Local Civil Rule 56.

Defendant, in its opposition to Plaintiff's motion to strike (No. 64), points to its electronic filing of the Separate Statement

CIVIL NO. 09-1824 (JP)          -15-

on the CM/ECF site on August 12, 2010, which does contain citations to the record. Defendant states that subsequent to filing its Separate Statement electronically, Defendant sent courtesy copies on August 13, 2010, to Plaintiff's counsel. Defendant states that the courtesy copy was not a final copy of the Separate Statement, which inadvertently did not include references to the record.

The Court has reviewed the Separate Statement filed electronically by Defendant, and finds that the electronically filed version of Defendant's Separate Statement does contain citations to the record. As such, the Court **DENIES** Plaintiff's motion to strike and/or for summary disposition of Defendant's motion for summary judgment.

Further, under Local Civil Rule 56(e), the Court "may disregard" statements that are not supported by specific citations to record materials. Thus, contrary to arguments made by Plaintiff, the rule does not require the Court to strike the entirety of Defendant's Separate Statement.

### III. <u>LEGAL STANDARD FOR A MOTION FOR SUMMARY JUDGMENT</u>

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate when "the record, including the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits, viewed in the light most favorable to the nonmoving party, reveals no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law."

CIVIL NO. 09-1824 (JP)          -16-

Fed. R. Civ. P. 56(c); see also Zambrana-Marrero v. Suárez-Cruz, 172 F.3d 122, 125 (1st Cir. 1999) (stating that summary judgment is appropriate when, after evaluating the record in the light most favorable to the non-moving party, the evidence "fails to yield a trial worthy issue as to some material fact"); Goldman v. First Nat'l Bank of Boston, 985 F.2d 1113, 1116 (1st Cir. 1993); Canal Ins. Co. v. Benner, 980 F.2d 23, 25 (1st Cir. 1992).  The Supreme Court has stated that "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.  Factual disputes that are irrelevant or unnecessary will not be counted." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  In this way, a fact is material if, based on the substantive law at issue, it might affect the outcome of the case.  See Mack v. Great Atl. and Pac. Tea Co., Inc., 871 F.2d 179, 181 (1st Cir. 1989).

On a summary judgment motion, the movant bears the burden of "informing the district court of the basis for its motion and identifying those portions of the [record] which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Once the movant meets this burden, the burden shifts to the opposing party who may not rest upon mere allegations or denials of the pleadings, but must affirmatively show, through the filing of supporting affidavits or otherwise, that there is a genuine issue of material fact for trial.

CIVIL NO. 09-1824 (JP)          -17-

See Anderson, 477 U.S. at 248; Celotex, 477 U.S. at 324; Goldman, 985 F.2d at 1116.

## IV.   **ANALYSIS**

Defendant argues for partial summary judgment of all of Plaintiff's damages claims with the exception of the damages from the IIBI Contract because Plaintiff fails to establish that Defendant's conduct caused Plaintiff to suffer the damages it claims and Plaintiff has no admissible evidence to support its damages claims. Defendant also argues for summary judgment of Plaintiff's obstinacy claim.  Plaintiff argues that Defendant breached its contract with Plaintiff by delaying to issue Plaintiff's ISO 17025 re-certification and by incorrectly informing Plaintiff's customers that Plaintiff did not have ISO 17025 certification.  The Court will now consider the parties' arguments.

### A.   **Plaintiff's Damages Claims**

In Puerto Rico, damages which arise "from breach of contract as well as those arising from the negligent performance of any type of obligation are recognized by the Civil Code as compensable." Computec Systems Corp. v. General Automation, Inc., 599 F. Supp. 819, 826-27 (D.P.R. 1984) (citing P.R. Laws Ann. tit. 31, §§ 3018, 3020). In Computec, the Court explained:

> [u]nless the damage claimed is proven to have in fact existed and to have been related to the injurious act, no compensation can be awarded, for Puerto Rico law does not sanction punitive damages.

CIVIL NO. 09-1824 (JP)          -18-

599 F. Supp. at 826 (citing Pérez v. Sampedro, 86 D.P.R. 526, 530 (1962)).

The First Circuit Court of Appeals has stated that in Puerto Rico an "injured party has the right to recover for the damages actually suffered and for lost profit." Noble v. Corporación Insular de Seguros, 738 F.2d 51, 54 (1st Cir. 1984) (citing Zeno v. Vázquez Rosario, 106 D.P.R. 324, 326-29 (1977); Pérez v. Sampedro, 86 D.P.R. 526, 530 (1962)). Damages are compensatory. See Noble, 738 F.2d at 54. Moreover, damages may not be speculative. MVM, Inc. v. Rodríguez, 568 F. Supp. 2d 158, 170 (D.P.R. 2008) (denying Plaintiff's damages claim as to a contract that was still valid but that Plaintiff argued may in the future be rescinded because of the harm Defendant caused to its reputation, as "speculative" and "not the real damages which [Plaintiff] must prove").

In the complaint, Plaintiff alleges damages as follows: (1) economic losses directly resulting from the cancellation of the IIBI Contract at not less than $3,126,773.00; (2) loss of all future projected business between Plaintiff, IIBI, and other laboratories in the Dominican Republic at not less than $15,000,000.00; (3) economic losses directly resulting from the cancellation of contracts in Puerto Rico at not less than $3,000,000.00; (4) loss of Plaintiff's economic resources and investments it had made to enter the Dominican Republic market at not less than $500,000.00; (5) loss

CIVIL NO. 09-1824 (JP)          -19-

to Plaintiff's good commercial name and goodwill at not less than $5,000,000.00; and (6) economic losses as a result of Plaintiff's commercial impairment to do business in the Dominican Republic, Puerto Rico, the Caribbean and Latin America as not less than $9,000,000.00.     Thus,  Plaintiff  is  claiming  approximately $35.6 million in damages.

The Court will review Plaintiff's damages claims with respect to the various markets and contracts separately herein.

    1.    <u>The IIBI Contract</u>

Defendant contends that the damages associated with the IIBI Contract are limited to $16,000.00, as the executed IIBI Contract only included quote number 06TSQ-150 and not quote number 05TSQ-284 in the amount of $685,000.00.   According to Defendant, one of Plaintiff's witnesses, Plaintiff's representative, Santos, testified that the IIBI Contract only bound IIBI to quote number 06TSQ-150, the first section of the General Proposal, and that the amount due under General Proposal quote 05TSQ-284 was still subject to negotiation. As for the other quotes submitted to IIBI as part of the General Proposal, Defendant points to the testimony of Santos, who testified that the work had been placed on hold by IIBI.

 Plaintiff counters that, according to the language of the IIBI Contract, both quote number 06TSQ-150 in the amount of $16,000.00 and quote number 05TSQ-284 in the amount of $685,000.00 are incorporated. The relevant provision of the IIBI Contract states, "[d]uring the

CIVIL NO. 09-1824 (JP)              -20-

term of this contract MTC [Metro Tech] will perform the service as
it appears in quote number 06TSQ-150 and General Proposal number
05TSQ-284."

     As for the other quotes issued to IIBI, Plaintiff also cites to
Santos' testimony that the proposal to IIBI included various stages
but that the fees had been negotiated and agreed upon.  Plaintiff
also pointed to the General Proposal, which had been submitted to
IIBI.

     The parties do not dispute the existence of a contract between
Plaintiff and IIBI and that IIBI terminated the contract on August 3,
2007 because it believed that Plaintiff did not have ISO 17025
certification.  See ISC UMF Nos. 14 and 20.  Moreover, the parties
agreed that Plaintiff entered into a contract for services with IIBI
pursuant to quote number 06TSQ-150 and General Proposal number
05TSQ-284 and that Plaintiff was required to have ISO 17025
certification. See ISC UMF No. 15.  The parties also stipulated that
IIBI canceled its contract with Plaintiff after receiving
confirmation from Defendant's representative that Plaintiff was not
ISO 17025 certified.  See ISC UMF Nos. 16, 20 and 21.

     After considering the arguments and evidence, the Court finds
that there is still factual disputes as to the exact amount lost
under the IIBI Contract and the General Proposal, which should be
decided by the finder of fact.  Accordingly, the Court **DENIES**

CIVIL NO. 09-1824 (JP)          -21-

Defendant's summary judgment motion with respect to Plaintiff's claimed losses associated with the IIBI Contract.

       2.   <u>Plaintiff's Damages Claims in the Dominican Republic</u>

Defendant contends that Plaintiff has no admissible evidence demonstrating that any action by Defendant caused Plaintiff to lose business in the Dominican Republic. Defendant argues that Plaintiff's witnesses have no direct knowledge of the quotes Plaintiff submitted to the Riquel Group and Panzardi and that none of Plaintiff's witnesses knows why the quotes were not accepted or whether the projects were ever funded or completed. In support, Defendant cites to the testimony of Cotto, who handled these quotes and testified that he did not receive any communication written or oral that the quotes were not accepted because of Defendant's conduct.

In opposition, Plaintiff presented testimony that IIBI began referring Plaintiff to work with other companies in the Dominican Republic, and that other governmental entities in the Dominican Republic began contacting Plaintiff as a result of its relationship with IIBI. Plaintiff provided evidence that the end user of the quote provided to Panzardi for $685,000.00 was IIBI, and thus, the project was connected to Plaintiff's relationship with IIBI. Cotto testified that when the incident with Defendant occurred the Riquel Group ended its relationship with him, and that he did not know whether the project was ever completed.

CIVIL NO. 09-1824 (JP)              -22-

In addition, Plaintiff presented the testimony of Cotto who stated that he decided to stop working with Plaintiff even after receiving confirmation of Plaintiff's certification and instead chose to work with another company. Cotto testified that he received complaints from customers that Plaintiff was misrepresenting its certification status. Plaintiff presented the letter from Cotto to Plaintiff in August 2007, expressing that he would no longer be doing business with Plaintiff and explaining that Defendant was telling Plaintiff's customers that Plaintiff was not ISO 17025 certified and that customers were cancelling services as a result. Plaintiff also presented the letter from Sánchez of Technalab, stating that Cotto's business had slowed with IIBI and other companies because of Cotto's association with Plaintiff and advising Cotto to stop working with Plaintiff.

As previously stated, both parties agreed that IIBI canceled its contract with Plaintiff after Defendant's representative stated that Plaintiff was not ISO 17025 certified. See ISC UMF Nos. 16, 20 and 21.

The evidentiary record is not sufficiently clear to permit the Court to decide these factual disputes on summary judgment. Accordingly, the Court **DENIES** Defendant's motion for partial summary judgment as to the damages relating to Plaintiff's business in Dominican Republic.

CIVIL NO. 09-1824 (JP)          -23-

### 3.   Plaintiff's Damages Claims in Puerto Rico

Defendant argues that Plaintiff is unable to present admissible documentary or testimonial evidence to support Plaintiff's damages claims associated with Puerto Rico.  Defendant presented evidence that Plaintiff submitted quotes to Caribbean Refrescos and Alchem Laboratory after the August 12, 2008 expiration date on Plaintiff's ISO 17025 certificate even though Plaintiff knew that both companies required Plaintiff to be certified.  Defendant also presented evidence that Plaintiff's proposal to the Highway Authority, which was not accepted, was submitted on November 12, 2008, after Plaintiff's accreditation expired in August.  Defendant argues that Plaintiff could have renewed its accreditation but chose not to.

With respect to the quotes submitted by Plaintiff to other companies in Puerto Rico, Defendant pointed to the testimony of Plaintiff's witnesses, who testified that they did not know why the quotes were not accepted.  Defendant argues that Plaintiff did not provide any evidence to show that these companies rejected the quotes because of any action by Defendant.  Defendant presented evidence that these quotes could have been rejected for a number of reasons unrelated to Defendant's conduct.

Plaintiff presented testimonial evidence that it customarily provided services to its long-term clients without a formal contract. Plaintiff would simply send a quote to a client, who would accept the quote by sending a purchase order.  Plaintiff presented evidence

CIVIL NO. 09-1824 (JP)          -24-

showing that the clients to whom they submitted quotes had required Plaintiff's services in the past until the ISO 17025 certification issue arose.  Plaintiff also presented testimonial evidence that it lost business in Puerto Rico from clients, such as Boston Scientific, Guidant, the Highway Authority, Caribbean Refrescos, and Chesebrough Pond's Manufacturing, because of the delay in obtaining the ISO 17025 certification from Defendant.  For example, Plaintiff pointed to the task lists detailing phone calls that it received from Boston Scientific on numerous occasions in 2006 attempting to confirm Plaintiff's certification status and stating that Boston Scientific would discontinue using Plaintiff's services if it did not receive confirmation of Plaintiff's ISO 17025 certification.

     With regard to the quote submitted to the Highway Authority in November 2008, Plaintiff presented evidence that it lost quote 08TSQ-242 for $75,000.00 because Defendant told the Highway Authority that Plaintiff's certification expired in April 2006.  Plaintiff points to testimonial evidence and emails between Defendant's representative and Plaintiff that the certification was to be for a three-year term.  Thus, Plaintiff argues that the certification would not have expired until April 2009.  Plaintiff also presented testimonial evidence that it had asked Defendant to issue a revised certificate, and that in the meantime, Plaintiff continued to represent to clients that it was ISO 17025 certified because it

CIVIL NO. 09-1824 (JP)          -25-

believed that the certification was incorrectly issued for a shorter time period.

     After considering the arguments and evidence, the Court finds that the evidentiary record does not conclusively establish whether or not Plaintiff's customers in Puerto Rico would have accepted the quotes provided by Plaintiff or that Defendant's conduct caused Plaintiff's damages.  Accordingly, the Court **DENIES** Defendant's motion for partial summary judgment as to Plaintiff's claims of damages in Puerto Rico.

                    4.   Plaintiff's damages claims in the CAFTA[1] countries
                         and other damages claims

     Defendant argues that Plaintiff has no evidence to support its damages claims for the loss of business in the CAFTA countries, where Plaintiff had never entered into contracts, submitted quotes or proposals to companies, or engaged in any marketing activities. Defendant points to Dr. Juan Lara's, Plaintiff's expert, report where he states that the consultants were not shown contracts or quotes for business in Central America.

     Plaintiff presented testimonial evidence that it planned to use its business in the Dominican Republic as an entry point to move into the markets of the CAFTA countries.  Plaintiff demonstrated that it began working with Cotto, who had experience in the quality assurance

_____

1.   The term "CAFTA countries" refers to Costa Rica, El Salvador, Guatemala, Honduras, and Nicaragua - countries which are parties to the Dominican Republic-Central America Free Trade Agreement ("DR-CAFTA").

CIVIL NO. 09-1824 (JP)          -26-

field and had provided services to companies in the Dominican Republic, El Salvador, Honduras, Guadalupe, Martinique, Haiti and Costa Rica through his company, CMCXpert.   Plaintiff presented evidence that while it did not have signed contracts in the DR-CAFTA countries, except for the IIBI Contract in the Dominican Republic, the cancellation of the IIBI Contract severely affected any potential opportunity it had to enter the markets of the CAFTA countries. Plaintiff also demonstrated that its reputation in the area was harmed by Defendant's delay and mistakes in issuing the ISO-17025 certification and by the actions of Defendant's representatives, who misinformed Plaintiff's clients about its certification status.

Plaintiff has presented evidence in the form of the IIBI Contract and the General Proposal, and quotes it submitted to customers in Puerto Rico and the Dominican Republic as well as testimony to show how the certification issues and Defendant's actions affected Plaintiff's business in these countries. Nevertheless, the above referenced contract, quotes, and proposal account for only a small fraction, of the approximately $35.6 million that Plaintiff claims in damages.

While an injured party does not need to prove the amount of its damages "with mathematic certainty, its calculation must at least rest on a reasonable basis and not on mere speculation or guess." Computec Systems Corp. v. General Automation, Inc., 599 F. Supp. 819, 827 (D.P.R. 1984)(citing González Mena v. Danmiller Coffee Co.,

CIVIL NO. 09-1824 (JP)          -27-

48 D.P.R. 608 (1935)); see also MVM, Inc. v. Rodríguez, 568 F. Supp. 2d 158, 170 (D.P.R. 2008)(citing Goenaga v. West Indies Trading Corp., 88 D.P.R. 865, 911 (1963); White Star Bus Line, Inc. v. Glen Falls Indemnity, Co., 60 D.P.R. 852, 861 (1942)).

Even if Plaintiff could prove causation, Plaintiff's alleged lost profits depended on a number of variables, such as the costs associated with entry into the markets of the CAFTA countries, the financial and political stability of those countries, and the ability of Plaintiff to compete with existing businesses in those markets. The facts indisputably demonstrate Plaintiff had not even entered the markets of the CAFTA countries. Plaintiff did not submit any evidence identifying potential business deals that were lost or even potential clients in these countries. Furthermore, Plaintiff did not present evidence to support its separate claims of damages for loss of good commercial name and good will as a result of Defendant's breach of contract.

While Plaintiff is not required to establish the exact value of its claimed damages, Plaintiff's claims must rest on a reasonable basis and not, as they do here, on mere unsupported conclusory allegations. Accordingly, Defendant's motion for partial summary judgment is **GRANTED** as to Plaintiff's claims for damages for loss of its good commercial name and good will and its claims of economic losses as a result of its commercial impairment to do business in the CAFTA countries.

CIVIL NO. 09-1824 (JP)          -28-

**B.   Defendant's Motion for Summary Judgment as to Plaintiff's Obstinacy Claim**

Defendant argues that Plaintiff's obstinacy claim for failure to negotiate an extrajudicial settlement in good faith is not supported by any evidence.  Defendant presented evidence that, after receiving Plaintiff's notice of claim on September 13, 2007, Defendant and its counsel attempted to reach an extrajudicial resolution and that both parties communicated continuously from September 2007 to December 2007.  Defendant also presented evidence that its representative traveled to Puerto Rico to speak with Plaintiff's representative.  Defendant's representative, Bernier, testified that he offered to contact IIBI regarding the inaccuracy of Defendant's report that Plaintiff was not accredited but Plaintiff refused to allow Defendant to communicate with IIBI.  Furthermore, Defendant argues that Plaintiff refused to produce documents supporting its initial grossly excessive damages claim of over $44 million.  Defendant also points to the order issued by this Court on July 12, 2010 granting Defendant's motion to compel requiring Plaintiff to provide requested discovery to Defendant and ordering Plaintiff to reimburse Defendant for expenses related to that motion.

Plaintiff counters that it attempted to settle claims with Defendant but Defendant at no time made a settlement offer despite Defendant's admissions that it committed various mistakes in handling Plaintiff's account.  Plaintiff presented testimonial evidence that

CIVIL NO. 09-1824 (JP)          -29-

Bernier misinformed IIBI that Plaintiff's certificate was invalid and that Defendant did not inform Plaintiff that it had extended the period of time that it would provide accreditation services.

In diversity cases, the Court applies the substantive law of Puerto Rico, when Puerto Rico law supplies the basis for the decision. De León-López v. Corporación Insular de Seguros, 931 F.2d 116, 126 (1st Cir. 1991); Navarro de Cosme v. Hospital Pavía, 922 F.2d 926, 934 (1st Cir. 1991). For a finding of obstinacy, the Court must determine that a litigant was "unreasonably adamant or stubbornly litigious, beyond the acceptable demands of the litigation, thereby wasting time and causing the Court and the other litigants unnecessary expense and delay." De León López, 931 F.2d at 126 (affirming district court's finding of obstinacy where it "made explicit findings relative to appellant's . . . 'inordinate' insistence on indefensible positions, its stalling tactics, and its disregard of court orders"). Under Rules 44.1(d) and 44.3(b) of the Puerto Rico Rules of Civil Procedure, a "losing party who has been obstinate during the course of a lawsuit can be held liable for prejudgment interest (if a money judgment has eventuated) and for its adversary's attorneys' fees." Id.

Given that this litigation is still continuing, the Court hereby **DENIES** Defendant's motion for summary judgment as to Plaintiff's claim of obstinacy.

CIVIL NO. 09-1824 (JP)          -30-

## V.    **CONCLUSION**

In conclusion, the Court **GRANTS IN PART AND DENIES IN PART** Defendant's motion for summary judgment.  Also, the Court **DENIES** Plaintiff's motion to strike and/or for summary disposition of Defendant's motion for summary judgment.  Accordingly, the Court will enter a separate judgment dismissing with prejudice Plaintiff's claims for damages for loss of its good commercial name and good will and its claims of economic losses as a result of its commercial impairment to do business in the CAFTA countries.

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, this 14th day of October, 2010.

s/Jaime Pieras, Jr.
JAIME PIERAS, JR.
U.S. SENIOR DISTRICT JUDGE